UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JESSE PEOPLES,

                    Petitioner,

v.                                          Civil Action No. 2:06-cv-12281
                                            Honorable Bernard A. Friedman

BLAINE LAFLER,

                    Respondent.
_____/

### OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION, GRANTING IN PART A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Petitioner Jesse Peoples has filed a *pro se* petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. The habeas petition challenges Petitioner's 2003 convictions for first-degree murder, felon in possession of a firearm, and possession of a firearm during the commission of a felony (felony firearm). The Court has concluded from a review of the pleadings and state court record that Petitioner's claims do not warrant habeas corpus relief. Consequently, the habeas petition will be denied.

**I. Background**

**A. The Facts**

Petitioner was charged in Wayne County, Michigan with premeditated murder, MICH. COMP. LAWS § 750.316(1)(a), felony murder, MICH. COMP. LAWS § 750.316(1)(b), felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, and felony firearm, MICH. COMP. LAWS § 750.227b. The charges arose from allegations that Petitioner shot and killed Shannon Clark in Detroit on May 18, 2001. Clark's girlfriend, Thomasene Hunter, testified at Petitioner's

trial that she and Clark were living at 12257 Hartwell Street in Detroit on the night in question. She and Clark got home after 11:00 p.m. that night. Clark left the house shortly afterward, but said that he would be back. She never saw him again. Ms. Hunter admitted at trial that Clark had been selling marijuana and that he kept marijuana and cash in hiding places throughout the house.

Rodney Lowery lived near Shannon Clark and Thomasene Hunter at the time. He heard gunshots about 1:00 or 1:30 a.m., and when he looked outside, he saw an automobile driving down the street with no lights on. He went outside and saw Clark's body on the ground.

Police Officer Todd Push testified that he was dispatched to the crime scene. He saw Shannon Clark lying on the front lawn of 12251 Hartwell Street. Clark had been shot in the chest and in the back of his head. Evidence technician William Niarhos found $141.00 on Clark and two nine millimeter casings a few feet away from Clark's body. He also found over two pounds of marijuana inside Clark's residence at 12257 Hartwell Street.

### 1. Demetrious Powell

The key prosecution witnesses at Petitioner's trial were Demetrious Powell and Cornelius Harris. Powell testified that Petitioner telephoned him a couple of times on the night in question. During their first conversation, Petitioner stated that he and someone named "O" "blew it" on Hartwell Street and had to "do the guy." Petitioner stated that the guy had thrown his keys and that they had to leave because things did not go right. During a second telephone call to Powell, Petitioner stated that he went back to the house to look for the keys, but the house was full of people and he concluded that there was nothing there anymore.

Powell later asked Petitioner in person what had happened. Petitioner then

2

explained that he and "O" had parked on the street and watched Clark go in the house with his girlfriend. They saw Clark come back out of the house and leave. They waited for him to return home and then jumped out at him. Clark ran through the neighbor's yard where Petitioner and "O" caught up with him. Clark threw his keys and said, "I ain't got nothing." Petitioner responded, "It don't matter; let's go," meaning, "Let's go back to the house." "O" pushed Clark when Clark said that he did not have a key to the house. When it appeared that Clark was ready to swing at them, Petitioner shot Clark in the chest. Clark took off running, but collapsed on the front lawn. Petitioner then walked up to him and shot him in the head.

Powell admitted that, a few months before the murder, he had driven by the Hartwell address with Petitioner and a third person to determine Clark's schedule because he, Petitioner, "O," and some other men had planned to rob Clark of drugs and money. Powell claimed that he had not intended to commit a murder and that the extent of his involvement was planning a robbery.

Powell further testified that he, Petitioner, and Cornelius Harris were arrested on August 24, 2001, in Southfield, Michigan. All three of them were armed at the time, and they were driving a car that did not belong to them. Petitioner's weapon was a nine millimeter Sig Sauer gun. Following a police chase, their car crashed, and all three of them exited the car. The police detained them, and at the Southfield Police Department, Petitioner told Powell and Harris not to claim their guns because he had used his gun on "H" Street.

Powell explained at trial that he was subsequently contacted by the Drug Enforcement Administration (DEA). He decided to reveal what he knew about the Clark murder because the police possessed the murder weapon and he did not want to be implicated in the

3

murder.  He denied receiving any benefit from the DEA or the Wayne County Prosecutor's Office for his testimony at Petitioner's trial, although he admitted that he was given immunity from suit for any involvement in the incident with Shannon Clark.   He stated that he had already been sentenced for assault with intent to rob, home invasion, and a gun charge for the incident in Southfield.

### 2.  Cornelius Harris

Cornelius Harris testified that, during August of 2001, Petitioner told him about the homicide he committed on "H" Street.  Petitioner explained to him that he and "O" had planned to rob the victim of dope and money and were waiting for him to come home.  They saw the man and a woman go in the house.  The man came back out and left.  They waited for him to return and then ran up to him.  The man threw his keys and was hollering that he did not have anything.  When the man swung at "O," Petitioner shot him, but the man broke loose and ran. Petitioner then caught him a second time and killed him.  Petitioner commented to "O" that the job was messed up and that they could not do what they went over there to do.  The next day Petitioner went back to the house to look for the keys that the man had thrown, but the man's family was there.  He concluded that whatever was in the house was now gone.

Harris also testified about his arrest with Petitioner and Demetrious Powell in Southfield in August of 2001 after the three of them acquired a car without the owner's permission. Petitioner told Harris and Powell in the Southfield lock-up not to claim the guns because his gun had a murder on it and had been used on "H" Street.

Harris claimed that he told federal officials what he knew because they said that they had found a gun and he did not want to be held responsible for someone else's actions.

4

Harris stated that he received immunity for another crime that he witnessed, but that he did not receive any promises or favors for testifying at Petitioner's trial. He acknowledged that he was awaiting sentencing for the unrelated crimes that he committed in Southfield. He denied getting together with Demetrious Powell to "pin the murder" on Petitioner, and he claimed that Petitioner had threatened him after learning that he (Harris) had talked to the authorities.

### 3. Additional Witnesses, the Verdict, and Sentence

Police Officers Barbara Lazar and Keith Birberick testified about the vehicle chase and car crash involving Petitioner, Demetrious Powell, and Cornelius Harris in Southfield on August 24, 2001. They found three weapons inside the suspects' car and one weapon outside the car. Sergeant Timothy Ketvirtis testified that a bullet removed from the victim and two casings found on Hartwell Street were fired by the nine millimeter Sig Sauer semi-automatic pistol that Petitioner allegedly possessed on the night of the vehicle crash.

Dr. Cheryl Loewe testified that Shannon Clark died from three gunshot wounds and that the manner of death was homicide. Sergeant Ernest Wilson of the Detroit Police Department testified that he took statements from Demetrious Powell and Cornelius Harris in February of 2003. He claimed that Powell and Harris were not suspects in the Hartwell Street murder and that they were granted immunity for purposes of an investigative subpoena. According to Sergeant Wilson, Powell and Harris informed him what they knew about the case before their lawyers asked for the immunity agreement.

Petitioner did not testify or present any witnesses. His defense was that Demetrious Powell and Cornelius Harris were not credible witnesses and that they "cooked" up their testimony while in police custody.

5

On July 30, 2003, the jury found Petitioner guilty, as charged, of premeditated murder, felony murder, felon in possession of a firearm, and felony firearm.  The trial court sentenced Petitioner to two years in prison for the felony firearm conviction, followed by concurrent terms of life imprisonment for each murder conviction and thirty-eight months (three years, two months) to five years for the felon-in-possession conviction.

### B.  The Direct Appeal and Initial Habeas Petition

In an appeal of right, Petitioner alleged that:  (1) his convictions and sentence for premeditated murder and felony murder violated the constitutional protection against double jeopardy; (2) the trial court violated his right to a fair trial by refusing the jurors' request for a transcript of trial testimony; (3) the trial court violated his right to be present and his right to counsel during a critical stage of trial; and (4) his trial attorney was constitutionally ineffective for failing to call a witness.  The Michigan Court of Appeals agreed that the two murder convictions for the death of one victim violated the constitutional protection against double jeopardy.   Accordingly, the Court of Appeals remanded the case for modification of Petitioner's judgment of sentence to reflect a single conviction and sentence for first-degree murder, supported by two different theories.  The Court of Appeals affirmed Petitioner's convictions in all other respects. *See People v. Peoples*, No. 250680 (Mich. Ct. App. Dec. 14, 2004) (unpublished).

Petitioner raised the same claims, with the exception of the double jeopardy claim, in an application for leave to appeal in the Michigan Supreme Court.  He also raised two new claims, which alleged that the prosecutor used false testimony to obtain his murder conviction and that there was insufficient evidence to support the murder convictions.  On July

6

26, 2005, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Peoples*, 473 Mich. 884 (2005) (table).

Petitioner then filed his habeas corpus petition, raising the five claims that he presented to the Michigan Supreme Court on direct review. Petitioner had not exhausted state remedies for his fourth and fifth claims by raising those claims in the Michigan Court of Appeals. Consequently, the Court dismissed the fourth and fifth claims without prejudice and stayed the other claims.

### C. The State Collateral Appeal and Amended Petition

Following this Court's dismissal of Petitioner's fourth and fifth claims, Petitioner returned to the trial court and filed a motion for relief from judgment alleging prosecutorial misconduct and insufficient evidence. The trial court denied Petitioner's motion pursuant to Michigan Court Rules 6.508(D)(2) and 6.508(D)(3).[1]  The Michigan Court of Appeals denied

---

[1]  Rule 6.508(D) reads in relevant part as follows:

**(D) Entitlement to Relief.**  The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion

. . . .

(2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;

(3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates

(a) good cause for failure to raise such grounds on appeal or in the prior motion,

(b) actual prejudice from the alleged irregularities that support the claim for relief.

7

leave to appeal on the ground that Petitioner had failed to establish entitlement to relief under Rule 6.508(D). *See People v. Peoples*, No. 284840 (Mich. Ct. App. Sept. 24, 2008). On February 24, 2009, the Michigan Supreme Court denied leave to appeal for the same reason. *See People v. Peoples*, 483 Mich. 894 (2009) (table).

On April 13, 2009, Petitioner filed an amended brief in support of his habeas corpus petition. He alleged that: (1) the trial court foreclosed his jury from reviewing requested testimony; (2) he was denied his rights to counsel and to be present when the trial court instructed the jury in his and his attorney's presence; (3) trial counsel was ineffective for failing to call a pivotal witness to substantiate his defense; (4) the prosecutor used false testimony to obtain his convictions; and (5) there was insufficient evidence to support the murder conviction under either theory. The Court re-opened this case, and Respondent filed a supplemental brief.

Respondent argues that Petitioner's first claim is not cognizable on habeas review and that his second and third claims lack merit. Respondent contends that Petitioner's fourth and fifth claims are procedurally defaulted because Petitioner did not raise those claims on direct review of his convictions. Procedural default is not a jurisdictional limitation. *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 3274 (2010). The Court therefore will proceed to address Petitioner's claims on their merits, rather than analyze whether the claims are procedurally defaulted.

## II. Standard of Review

----

. . . .

The court may waive the "good cause" requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

8

State prisoners are entitled to the writ of habeas corpus only if the state court's adjudication of their claims on the merits

   (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

   (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. "[W]here factual findings are challenged, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct." *Goodwin v. Johnson*, 632 F.3d 301, 308 (6th Cir. 2011) (citing 28 U.S.C. § 2254(e)(1) and *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

9

decision." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 786 (2011).  To obtain a writ of habeas corpus from a federal court, a petitioner must show that the state court's decision "was so lacking in justification" that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 786-87.

## III.  Discussion

### A.  Denial of the Jury's Request for a Transcript

Petitioner alleges that the trial court violated his rights to a fair trial and due process of law by refusing the jurors' request for a transcript of trial testimony.  The jurors made their request during deliberations.  They sent a note to the trial court, saying, "Are we allowed to see the transcript?"  The trial court responded by saying, "The transcript is not available."  (Tr. July 29, 2003, at 6-7.)

Petitioner claims that the trial court's response gave the impression that the transcript would never be available.  According to him, the trial court should have asked for a more specific request and then advised the jurors that the court could make the transcripts available at a later time or the court could read the requested testimony to the jurors.  Petitioner claims that providing the transcript or re-reading testimony to the jury could have made a difference in the jury's verdict.  The Michigan Court of Appeals concluded on review of this claim that the trial court's response was accurate and did not amount to an abuse its discretion.

This Court has found no Supreme Court decision that requires trial courts as a matter of federal constitutional law to provide a transcript of trial testimony to a jury on request or to read back testimony to a jury.   The Supreme Court decisions cited by Petitioner merely stand for the broad principle that a defendant in a criminal case has the right to a properly

instructed jury.

Petitioner relies on a Michigan Court Rule that authorizes trial courts to instruct jurors to deliberate without the requested testimony only if "the possibility of having the testimony or evidence reviewed at a later time is not foreclosed." *See* Michigan Court Rule 6.414(J) (formerly Rule 6.414(H)). Even though the trial court did not offer to have transcripts prepared or to have trial testimony read back to the jury, Petitioner's reliance on the state court rule is misplaced, because "[a] federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Furthermore, encouraging a jury to partake in further deliberations without the aid of a requested transcript is not, in itself, an error. *Spalla v. Foltz*, 788 F.2d 400, 405 (6th Cir. 1986). And the United States Court of Appeals for the Sixth Circuit has stated that there is no federal constitutional right to have testimony read back to a jury. *See Bradley v. Birkett*, 192 F. App'x. 468, 477 (6th Cir. 2006). "It is generally within the trial court's sound discretion to determine whether particular jury requests will be granted." *Spalla v. Foltz*, 788 F. 2d at 405.

Here, the trial court did not refuse to have a transcript prepared or to read testimony to the jurors. Instead, the court stated accurately that there was no transcript. Even if the jury interpreted the trial court's response as foreclosing the possibility of acquiring a transcript or a reading of testimony, the error did not rise to the level of constitutional error. The jurors requested large amounts of testimony, *cf. Fondren v. LeCureux*, 36 F.3d 1097, 1994 WL 508259, at *8 (6th Cir. 1994) (unpublished), and double exposure to selected testimony can lead to undue emphasis or be viewed out of context by the jury, *Fossyl v. Milligan*, 317 F. App'x 467, 478 (6th Cir. 2009).

11

The trial court's failure to provide a transcript of trial testimony to the jury and the court's failure to offer to read back testimony did not deprive Petitioner of his constitutional right to a fair trial.  Thus, the state court's decision was not contrary to clearly established federal law, and Petitioner has no right to relief on the basis of the trial court's statement that there was no transcript.

### B.  The *Ex Parte* Communication

In a related claim, Petitioner alleges that the trial court's response to the jury's request for the transcript of testimony was exacerbated by the fact that he and his trial attorney were not present at the time.  Petitioner claims that the trial court violated his right to be present and his right to counsel during a critical stage of trial.

The Michigan Court of Appeals stated on review of this claim that, although an improper *ex parte* communication occurred, reversal was not warranted.  The Court of Appeals categorized the trial court's response to the jury as an administrative communication, which did not involve a critical stage of trial.  The Court of Appeals stated that prejudice could not be presumed, and because Petitioner failed to show actual prejudice as a result of his and his attorney's absence, reversal was not warranted.

### 1.  The Right to be Present

"[T]he right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant."  *Rushen v. Spain*, 464 U.S. 114, 117 (1983).  "When an *ex parte* communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties."  *Id*. at 119.  Nevertheless, "the mere occurrence of an *ex parte* conversation between a trial judge and a juror

does not constitute a deprivation of any constitutional right.  The defense has no constitutional right to be present at every interaction between a judge and a juror . . . ."  *Id*. at 125-26 (Stevens, J., concurring).

The jurors' communication with the trial court in this case was not "tantamount to a request for further instructions," *cf. Rogers v. United States*, 422 U.S. 35, 39 (1975), and the trial court's response to the jurors' request "did not address any fact in controversy nor any law applicable to the case.  There was no substantive communication."  *Tate v. Morris*, 909 F.2d 1485, 1990 WL 117367, at *4 (6th Cir. Aug. 14, 1990) (unpublished).  The trial court merely informed the jury that there was no transcript.  There was nothing coercive about the trial court's response.  The Court therefore finds that any violation of the right to be present was harmless.  *See United States v. Armstrong*, 216 F.3d 1084, 2000 WL 425007, at *4 (9th Cir. 2000) (unpublished decision concluding that *ex parte* communications between a trial court and deliberating jury, including a request for a transcript of a prosecution witness's testimony, was harmless error where there was nothing prejudicial about the content of the jury's notes to the trial court or the court's responses).

**2.  The Right to Counsel**

The next question is whether the *ex parte* communication violated Petitioner's right to counsel.  "The constitution requires that a defendant be represented at every critical stage of his trial."  *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992).  A "critical stage" is "a step of a criminal proceeding, such as arraignment, that [holds] significant consequences for the accused."  *Bell v. Cone*, 535 U.S. 685, 695-96 (2002).  "[T]he complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice . . . ."  *Roe v.*

13

*Flores-Ortega*, 528 U.S. 470, 483 (2000).  Therefore, "harmless error analysis does not apply to Sixth Amendment claims involving the absence of counsel at a critical stage."  *French v. Jones*, 332 F.3d 430, 438 (6th Cir. 2003).  The "absence of counsel during a critical stage of a trial is per se reversible error."  *Id*.

Cases in which the Court of Appeals for the Sixth Circuit "has found denial of counsel at a critical stage invariably involve a court instructing the jury about the substantive elements of an offense or giving a deadlocked jury further instructions about how to proceed."  *Valentine v. United States*, 488 F.3d 325, 335 (6th Cir. 2007).  The trial court's *ex parte* response to the jury's question in this case was not a discussion of the law or an instruction to a deadlocked jury to keep deliberating.[2]  It was merely an explanation about the lack of a trial transcript.

The *ex parte* communication with the jury does not fit within the category of jury instruction or re-instruction that demanded the presence of counsel.  *Cf. French v. Jones*, 332 F.3d at 436; *Caver v. Straub*, 349 F.3d 340, 348-50, 350 n.8, 353 (6th Cir. 2003).  Therefore, prejudice is not presumed, and harmless-error analysis applies to the trial court's communication with the jury in the absence of counsel.  *See United States v. Harris*, 9 F.3d 493, 499 (6th Cir. 1993); *United States v. Toliver*, 330 F.3d 607, 612 (3d Cir. 2003).

Petitioner implies that, if defense counsel had been present, he would have asked the trial court to inform the jurors that their request for a transcript had to be specific and that a transcript could be prepared, or specific testimony could be read to them, if they insisted.  The

---

[2]  Although the jury subsequently expressed an inability to reach a decision (Tr. July 29, 2003, at 17), that communication occurred about three and a half hours after the jury requested a transcript of trial testimony.

14

evidence against Petitioner was substantial, however, and even if the jurors had been specific as to the testimony they wished to review, there is no reason to believe that a review of the testimony would have helped Petitioner.  As noted above, double exposure to selected testimony can lead to undue emphasis or be viewed out of context by the jury.  *Fossyl v. Milligan*, 317 F. App'x at 478.  The Court therefore concludes that, even though defense counsel should have been consulted and present when the jury's request for a transcript was read into the record and addressed by the trial court, the absence of counsel did not result in actual prejudice to Petitioner.  The error was harmless.

### C.  Trial Counsel

Petitioner alleges that his trial attorney's failure to call a Southfield police officer as a defense witness amounted to constitutionally ineffective assistance.  Petitioner contends that the officer would have testified that Cornelius Harris was the driver of the car involved in the car crash in Southfield, Michigan.  The gun on the floor board of the driver's side of that car was determined to be the gun used to kill Shannon Clark in Detroit on May 18, 2001.  Consequently, Petitioner claims that he would have had a likely chance of acquittal if counsel had produced the officer and the officer had testified that Harris was the driver of the car.

The Michigan Court of Appeals adjudicated this claim on the merits and concluded that defense counsel was not ineffective for failing to call the officer.  The Court of Appeals opined that Petitioner had "not overcome the presumption that counsel's decision not to call the police officer was a matter of trial strategy."  *Peoples*, 2004 WL 2877313, at *3.

### 1. Clearly Established Federal Law

The Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984),

15

is clearly established federal law. *Cullen v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1403 (2011). Under *Strickland*, an attorney is constitutionally ineffective if "counsel's performance was deficient" and "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. To establish deficient performance, a habeas petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

To demonstrate that counsel's performance prejudiced the defense, a habeas petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 788 (internal and end citations omitted).

### 2. Application

The Southfield police officer in question here wrote in a narrative report that he could identify Cornelius Harris as the driver of the Jaguar involved in the Southfield car crash, which led to Petitioner's arrest on August 24, 2001. "The decision whether to call a witness is

16

generally a matter of trial strategy and, absent a showing of prejudice, the failure to call a witness does not deprive a defendant of effective assistance of counsel." *Samamar v. Clarridge*, 225 F. App'x 366, 372 (6th Cir. 2007).  Defense counsel's failure to produce the Southfield police officer as a witness did not amount to deficient performance for the following reasons.

First, "[t]he police officer's identification of Harris as the driver of the Jaguar was inconsequential where it was undisputed that defendant and Harris were both present in the Jaguar and where this incident was unrelated to the charged crime." *Peoples*, 2004 WL 2877313, at *3.  "A defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *Millender v. Adams,* 376 F.3d 520, 527 (6th Cir. 2004) (quoting *Millender v. Adams*, 187 F. Supp. 2d 852, 877 (E.D. Mich. 2002) (citing *Marra v. Larkins*, 111 F. Supp. 2d 575, 585 n. 13 (E.D. Pa. 2000)).

Second, "[Demetrious] Powell testified that the impact of the crash altered the location of the guns, and one gun was located outside the car following the crash." *Peoples*, 2004 WL 2877313, at *3.  Therefore, the location of the guns following the car crash was not necessarily indicative of who had possession of the guns before the crash.

Third, the fact that the murder weapon was found near the driver's seat of the car did not mean that the driver was the person who murdered Shannon Clark three months earlier. Finally, the officer's testimony about the circumstances surrounding Petitioner's arrest in Southfield could have opened the door to prejudicial information about the Southfield case, which involved an assault, a home invasion, and a firearm offense.

The Southfield police officer's testimony would not have provided Petitioner with a substantial defense.  Therefore, defense counsel's decision not to call the police officer was

17

reasonable trial strategy and not deficient performance.  Trial counsel was not ineffective for failing to produce the officer.

### D.  The Prosecutor

Petitioner alleges next that the prosecutor used false testimony to obtain his murder conviction.  According to Petitioner, Cornelius Harris and Demetrious Powell perjured themselves at trial when they testified that they were not promised anything and did not receive anything for their testimony. Petitioner claims that this testimony is belied by the fact that Harris was sentenced to only twelve months in jail for the incident in Southfield, Michigan, and Powell filed a motion for re-sentencing.

### 1.  Clearly Established Law

The "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"  *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).  "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  To prevail on his claim that the prosecutor used false testimony, Petitioner must show that (1) the testimony was actually false, (2) that the false statements were material, and (3) that the prosecutor knew the testimony was false.  *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)).

The Supreme Court does not "automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the

18

defense but not likely to have changed the verdict . . . .'" *Giglio*, 405 U.S. at 154 (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968)). Instead, "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . .'" *Id*. (quoting *Napue*, 360 U.S. at 271); *see also Foley v. Parker*, 488 F.3d 377, 391-92 (6th Cir. 2007) (explaining that "[t]he knowing use of perjured testimony, including the failure to correct false testimony, constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury").

### 2. The Relevant Facts

#### a. Demetrious Powell

Demetrious Powell testified at Petitioner's trial that, after his arrest in Southfield, he decided to tell the DEA what he knew about Petitioner's involvement in the Clark murder. Powell denied receiving any assistance or benefit from the DEA, from the Oakland County Prosecutor's Office, from the Wayne County Prosecutor's Office, or from the Detroit Police Department. He did admit to receiving immunity from suit for any participation in the incident with Shannon Clark, but he claimed that he was testifying because it was the right thing to do. He also said that he did not want to be implicated in the murder of Shannon Clark and that it was time to make a change. (Tr. July 24, 2003, at 115-17, 143-5, 149.)

Powell had previously pleaded guilty and no contest to several charges in Oakland County Circuit Court for the Southfield incident. At his plea proceeding, Powell assured the trial court that there was no plea bargain and that no other promises had been made

19

to induce his plea, other than the Cobbs agreement[3] that the trial court would sentence him at the low end of the sentencing guidelines.  The prosecutor and defense counsel also stated that they were not aware of any additional promises to induce Powell to tender his plea.  (Tr. Nov. 4, 2002, at 9, 12, 20.)

At Powell's sentencing on May 20, 2003, Powell stated that he had been promised help in return for his cooperation with the authorities but that, in the end, "They just left [him] out to dry" and exposed his cooperation to Petitioner and Petitioner's associates, who were dangerous people and who would not hesitate to "put[] a hit on somebody."  (Tr. May 20, 2003, at 13-14.)  This comment suggests that Powell not only received nothing for his cooperation with the authorities, but that his cooperation in fact endangered him.

Furthermore, Powell was convicted and sentenced before Petitioner's trial.  The court that sentenced Powell acknowledged Powell's cooperation and sentenced him at the low end of the sentencing guidelines.  Powell's attorney, however, did not think that the court knew about Powell's cooperation when the court agreed to sentence Powell at the low end of the guidelines.  Therefore, it does not appear that the trial court's agreement to sentence Powell at the low end of the guidelines was based on Powell's cooperation with authorities.  Petitioner has failed to show that Powell testified falsely at Petitioner's trial when he claimed that he received nothing in return for his testimony.

### b.  Cornelius Harris

---

[3] *See People v. Cobbs*, 443 Mich. 276, 283 (1993) (recognizing "an additional manner in which a judge may participate in sentence discussions.  At the request of a party, and not on the judge's own initiative, a judge may state on the record the length of sentence that, on the basis of the information then available to the judge, appears to be appropriate for the charged offense") (emphasis omitted).

Cornelius Harris also testified at Petitioner's trial that he was not promised anything for his testimony. Harris stated that his motive for testifying was that he did not want to be held responsible for another person's actions. He thought that Petitioner should step forward and take responsibility for his own actions. (Tr. July 28, 2003, at 54, 70.)

Petitioner points out that Harris was awaiting sentencing on charges for the Southfield incident when he testified at Petitioner's trial (*id*. at 69), and that Harris ultimately received a sentence of only twelve months in jail for the Southfield incident. Harris's light sentence does not necessarily mean that he had a deal with prosecutors to be treated leniently in his Southfield case in exchange for his testimony at Petitioner's trial.[4] In fact, a police officer testified that both Harris and Powell disclosed what they knew about the Clark murder before their attorneys requested immunity. (*Id*. at 149-50.) Harris may have received leniency in his criminal case for the Southfield crimes on the basis of his relatively minor criminal record, which consisted of delivery of cocaine under 50 grams. He was sentenced in that case to three to twenty years in prison and apparently was discharged after five years. Powell, on the other hand, had a criminal record, which included convictions for two armed robberies and one count of felony firearm.

Petitioner has not shown that Harris and Powell gave false testimony when they testified that they received nothing in return for their testimony. Petitioner also has not shown that the prosecutor knew the testimony was false.

---

[4] Respondent has been unable to locate the transcript of Harris's plea and sentencing proceedings. The Court therefore has been unable to determine whether Harris had a plea agreement or deal with prosecutors in exchange for his cooperation in the Wayne County case against Petitioner.

### 3.  Whether the Alleged Perjury Affected the Jury's Verdict

Even if Harris and Powell gave false testimony when they claimed that they received nothing in return for their testimony, both men were examined and cross-examined about their motives for testifying.  In addition, defense counsel was permitted to argue that Powell and Harris were given immunity for the crime of murder, and when the prosecutor objected, the trial court overruled the objection, noting that Powell had testified that he did not want to get implicated or charged with the murder.  (*Id*. at 203-04.)   The trial court later gave an "agreement for testimony" jury instruction which read:

> You have heard testimony that witnesses Cornelius Harris and Demetrious Powell made agreements with the prosecutor about charges against them in exchange for their testimony in this trial.  You are to consider this evidence only as it relates to Cornelius Harris and Demetrious Powell's credibility as it may tend to show Cornelius Harris' or Demetrious Powell's bias or self-interest.

(*Id*. at 222-23.)

In light of this jury instruction and the testimony that the jury did hear, there is not a reasonable likelihood that the failure to disclose additional information about an alleged deal with prosecutors would have affected the jury's verdict.  Petitioner therefore has no right to relief on the basis of his claim that the prosecutor used perjured testimony or allowed perjured testimony to go uncorrected..

### E.  The Sufficiency of the Evidence

Petitioner's fifth and final claim alleges that there was insufficient evidence to support his murder conviction under either theory (premeditated murder or felony murder).  The relevant question on habeas corpus review of a sufficiency-of-the-evidence claim is

> whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

22

beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal citation omitted) (emphasis in original).

### 1. Felony Murder

Petitioner claims that there was no evidence to support the felony murder conviction because nothing was taken from the victim. The elements of felony murder are (1) the killing of a human being, (2) with malice, (3) while committing, attempting to commit, or assisting in the commission of specified felonies. *People v. Carines,* 460 Mich. 750, 759 (1999) (quoting *People v. Turner*, 213 Mich. App. 558, 566 (1995)). The underlying felony in this case was larceny, which is one of the felonies enumerated in the felony murder statute. *See* Mich. Comp. Laws § 750.316(1)(b).

Demetrious Powell testified that Petitioner confessed to shooting Shannon Clark in the head and that he and Petitioner, along with some other men, had planned to rob Clark of drugs and money. Cornelius Harris also testified that Petitioner had planned to rob Clark of drugs and money and that he shot Clark when Clark threw his keys and claimed not to have anything. Petitioner informed Harris that, when Clark broke loose and started to run, Petitioner caught Clark a second time and killed him. The next day Petitioner went back to the house to look for the keys that the man had thrown and concluded that whatever had been in the house was gone because the man's family was there. Petitioner told Harris and Powell in the Southfield lock-up not to claim the guns because his gun had a murder on it and had been used on "H" Street.

A rational juror could have concluded from this testimony that Petitioner shot and

killed Clark during an attempted larceny.  The fact that the larceny may not have been completed did not preclude a conviction for felony murder, because the statute specifically provides that a person is guilty of felony murder if a murder is committed during the perpetration of, *or attempt to commit*, a felony.  *See* Mich. Comp. Laws § 750.316(1)(b) (emphasis added).  The evidence therefore was sufficient to convict Petitioner of felony murder.

### 2.  Premeditated Murder

The evidence also was sufficient to convict Petitioner of premeditated murder, which requires showing that the defendant killed the victim and that the killing was "willful, deliberate, and premeditated."  *People v. Bowman*, 254 Mich. App. 142, 151 (2002) (quoting Mich. Comp. Laws § 750.316(1)(a)).  "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem."  *People v. Morrin*, 31 Mich. App. 301, 329 (1971) (internal and end footnotes omitted).  "While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'"  *Id*. at 330.

Harris's testimony that Petitioner approached the victim, chased the victim when he started to run, and then shot him a second time established that the shooting was premeditated.  The interval between the initial approach and the second shooting was long enough for Petitioner to take a second look at what he was doing.

Petitioner maintains that Harris perjured himself and was not a credible witness, but "[u]nder the *Jackson v. Virginia* standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.'"  *United*

24

*States v. Fisher*, __ F.3d __, __, 2011 WL 2802924, at *7 (6th Cir. July 19, 2011) (quoting

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)).  Thus, Harris's alleged lack of credibility

is not a basis for granting relief on a sufficiency-of-the-evidence claim.  Furthermore,

Demetrious Powell's testimony was sufficient to convict Petitioner of murder even if the jury

chose not to believe Harris's testimony.

A rational trier of fact could have concluded from the evidence taken in the light

most favorable to the prosecution that Petitioner was guilty of premeditated murder and felony

murder.  Petitioner therefore has no right to relief on the basis of his challenge to the sufficiency

of the evidence.

## IV.  Order

The state courts' rejection of Petitioner's claims did not result in decisions that were contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts.

Accordingly,

IT IS ORDERED that the petition for a writ of habeas corpus [dkt. #1] is DENIED.

IT IS FURTHER ORDERED that Defendant's motion for certificate of appealability is GRANTED on claim two (denial of the right to be present and the right to counsel) and claim four (prosecutorial misconduct) because  reasonable jurists could debate whether those issues should have been resolved differently or whether the claims deserve encouragement to proceed further.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

IT IS FURTHER ORDERED that Defendant's motion for a certificate of appealability is DENIED on the remaining claims because reasonable jurists would not find the Court's assessment of those claims debatable or wrong, nor conclude that the issues deserve encouragement to proceed further.  *Id.*

IT IS FURTHER ORDERED that Petitioner may proceed *in forma pauperis* on appeal because an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3).


S/Bernard A. Friedman_____
     BERNARD A. FRIEDMAN
     UNITED STATES DISTRICT JUDGE

Dated:  August 11, 2011